**Willie LAGWAY, Petitioner,**

v.

**William DALLMAN, Warden,
Respondent.**

**No. 5:90CV1653.**

United States District Court,
N.D. Ohio, E.D.

Nov. 13, 1992.

Kort W. Gatterdam, Ohio Public Defender Com'n, Columbus, Ohio, for petitioner.

Jack W. Decker, Office of the Atty. Gen., Columbus, Ohio, for respondent.

## ORDER

SAM H. BELL, District Judge.

On September 17, 1990, petitioner, Willie Lagway, filed a motion with the court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On July 23, 1992, pursuant to this court's order of reference, Magistrate Judge Gallas returned his report and recommendations. Both petitioner and respondent filed objections to the Magistrate Judge's report and recommendations.

## BACKGROUND

For reasons which will be apparent in the discussion which follows, a detailed exposition of the proceedings in this matter is necessary. The Summit County Grand Jury indicted petitioner on six counts of aggravated robbery, six counts of kidnapping, four counts of rape, one count of gross sexual imposition, and one count of

grand theft. Two of the aggravated robbery counts included a specification that the petitioner had a knife and/or handgun. The acts comprising the alleged crimes were asserted to have taken place February 10–15, 1983.

On March 7, 1983, on the occasion of petitioner's arraignment, he, through his then counsel, Attorney Ralph Capriolo, entered a formal plea of not guilty. Counsel noted at that time that a written plea of not guilty by reason of insanity had been filed. But Mr. Capriola asked permission "to withhold that, at least for one week, to determine whether or not it is advisable to go forward with that." (T. Vol. I, 2–3.) Without further discussion, Judge Reece, the trial judge, granted the request.

On March 16, Attorney Capriolo withdrew from the case. At a hearing on that date, the subject of the "withheld" plea did not arise. The trial court acted promptly to secure successor counsel for petitioner— by March 30, Attorney Patricia Millhoff had been appointed. Both she and prosecutor Robert Bulford received a report generated by the court's Psycho–Diagnostic Clinic concerning the competence of petitioner to stand trial. That report was discussed at the March 30 status conference. (*Id.* at 7.)

According to the report, psychologist Dan Reinhold was unable to administer a formal competency screening test because petitioner felt that formal tests would be very biased by reason of the examiner's affiliation with the state. However, based on the his interview of petitioner, Reinhold did give the following conclusions:

Willie was fairly well oriented in all spheres, and probably had good recall of both recent and remote events if he wished to reveal his recall. No readily apparent hallucinations or delusions were manifested.

Willie did state that he does go, at times, into a dream-like state which might reflect hallucinatory adventures, and part of his conversation was very similar to delusional systems found in psychotic patients. His judgment was somewhat impaired, although he seemed to have adequate insight into his behavior. His [obscured in copy] was appropriate, he gave evidence of having an average to above average intelligence, and he was in good contact with reality.

Willie gave all evidence of being a schizophrenic individual. Some thought disorders and pathological ideations were manifested. He was alert and lucid, coherent, but not always logical or rational. At times, he gave relevant answers to questions asked of him, and other times he would answer, in no way, relevant to the conversation. It is reasonable to believe that his behavior in the courtroom might be acceptable because he wants to be sent to jail where he can receive atonement for every day he spends in prison. His comprehension and conceptualization appeared to be highly impaired.

Willie is not competent to stand trial at the present time, he cannot appreciate the nature and consequences of the charge made against him, he does, apparently, have an adequate understanding of courtroom procedures but might find it very difficult to cooperate with his attorney to acquire a suitable defense. Willie is a mentally ill individual subject to hospitalization. There is a substantial possibility that he will be restored to reason within one year.

He is not a dangerous individual but one should be cautious that he might find a way to disassociate himself from any hospital to which he is admitted.

The information upon which this finding is made can be found in the Psycho–Diagnostic Clinic. If we can be of any further assistance, feel free to call this office.

(Respondent's Ex. B.)

On April 8, 1983, the trial judge held a competency hearing in which the Psycho–Diagnostic Clinic report was jointly submitted as evidence. (T. vol. I, 10.) No other reports or evidence were submitted. At the same time, Judge Reece dealt with petitioner's request to proceed in the case on his own. In the course of addressing petitioner's pending motion to withdraw Ms.

Millhoff as his attorney, the judge also questioned petitioner at great length regarding his competency to stand trial. (*Id.* at 11–48.) Without referencing the expert's report, the trial judge reached his own conclusion on the competency issue:

> Well, you seem pretty competent to me. You seem to know what is going on around you. You don't seem to be out of touch with reality anyway. I mean you got enough sense to tell me you don't like the lawyer you got, and you tell me why you got problems with her. You know what I'm doing here, you know what [the prosecutor] is doing here. You know what a jury's going to be doing here. You've been in a courtroom before in California, it seems to me like you know what you're doing.

(*Id.* at 48.) Immediately thereafter, the trial judge ruled that petitioner could proceed *pro se* subject to the continuing presence of Ms. Millhoff as stand-by counsel in the event petitioner changed his mind or had any questions. (*Id.* at 52). While the April 8 hearing is the focal point of petitioner's stated objections to the findings of the Magistrate Judge, this court believes it necessary to consider, as well, other hearings in the trial court bearing on issues of competency.

On May 4, the day before petitioner's trial, Ms. Millhoff renewed her motion concerning petitioner's competence by the following statement addressed to the trial court:

> He has basically not discussed with me the matters concerning this case, but most of our discussions have been of a philosophical nature and, in addition, it is my understanding that he is not eating in the Summit County Jail and has not done so for several days, and I would ask the Court on that basis, in addition to the fact that the report of Dan Reinhold of the Psycho–Diagnostic Clinic, that report is uncontroverted at this time—that the Court reconsider its motion and inquire of Willie regarding his competency at this time.

*Id.* at 66. Judge Reece did not address this motion at that moment but returned to it at the end of the meeting. By this time, petitioner had told the judge that he would not answer any questions because the judge was forcing him to participate in something of which he did not want to be a part. (*Id.* at 70–72.)

In response to counsel's motion, the trial court said: "I suppose the only new development I know of or has been brought to my attention regarding that aspect is his recent fast at the County Jail, I guess." Petitioner was then asked: "Do you have anything you choose to tell me about why you're fasting over at the jail?" (*Id.* at 73–74.) Petitioner refused to respond.

On the morning of May 5, at a suppression hearing, Ms. Millhoff withdrew completely from her active representation of petitioner. Petitioner did not respond to questions from the court at that hearing as well, so the trial court concluded that, "in the interest of protecting the Defendant's rights, in spite of his apparent desire not to have his rights protected, I believe that we should have counsel present, at least in the event the Defendant wishes to consult counsel during some course of the proceedings." (T. vol. II, 4–5.)

At that same hearing Ms. Millhoff once again renewed her motion to consider petitioner's competency.

> I have, again, no new information to give the Court, but he is obviously not speaking here today. We have documented evidence from the dispensary at the jail that he has not been eating. Based on the fact that there have been found ketones in his urine and that he has continued to indicate that he does not wish to have counsel present. Further, as I've indicated previously, the report of Dan Reinhold, as to his lack of competency to counsel, was still uncontroverted, and I would renew my motion on that basis. Thank you. If I might add, I would just ask that that be an ongoing motion rather than continue to make it throughout trial.

(*Id.* at 6–7.)

The trial judge's only response was to agree to the nature of the objection. "Yes, I think it is proper that it be an ongoing

motion. In fact, I think the Court has an obligation to consider the matter at all stages of the proceedings." (*Id.* at 7.) He did not respond to the objective indicia of incompetence and still did not comment on the Reinhold report. The cause proceeded to trial.

Prior to the voir dire on the afternoon of May 5, Ms. Millhoff placed in the record petitioner's desire that she not "voir dire the jury, give an opening statement or cross-examine witnesses." (T. vol. III, 5.) Prior to the defense voir dire, Ms. Millhoff noted for the record a written request by petitioner which she felt compelled to disregard or incompetent to perform. "If you address the jury to use any other law than my Father [sic] law, you are committing a crime against me and my Father, and I must ask my Father for justice in reference to you." (*Id.* at 8–9.)

The trial judge asked petitioner if he had any questions he wanted to ask the jury. Petitioner responded:

I express to you yesterday and you seem to be like Delilah, keep on, keep on, and you appealing to me to talk to you. I respect you, but that's why maybe my expressions yesterday, I don't have nothing to do with this. I'm going to make a presentation to the jury, but it won't be now. It will be after all this is over with.

(*Id.* at 10.) Pressed by Judge Reece, petitioner continued:

I'm not going to sue you all. I'm not even going to try to appeal. I'm just going to go to wherever you all send me and do the time, you know, and be with— have peace within myself, but I keep to thinking that you all feel as though I'm going to try to sue you all or bring some type of reprisal on you in reference to you all laws, but I'm not—if you understand me, I'm not going to use you laws for nothing. I know my allegiance.

. . . . .

So, you—if I'm not given any statements, it is because since me and the apparatus you use, we don't be in common, I don't know with each other, I wouldn't try to talk to that table right there, you ignorant and I know you're just doing some-

thing that mandate from the apparatus. By me not saying nothing, what I'm doing is doing like that table is doing, you know, I can't talk to that table. I can't talk to the apparatus. So, I don't say nothing.

. . . . .

So, if you can respect—not as a judge, but just as a man, just respect when I don't say nothing, it is not—I'm not—it is ignorant for me to try to talk to that table.

(*Id.* at 10–11.)

Petitioner asked that Ms. Millhoff not give an opening statement because she would not argue his "Father's law" and "[t]hat would be like Siamese twins, one trying to run backwards and one forward." (*Id.* at 14.) The court granted that request.

Petitioner was subsequently tried and convicted on all counts. During the trial, petitioner delivered the opening and closing arguments. These statements had little or nothing to do with the charges themselves. Petitioner also did not allow Ms. Millhoff to present any evidence or to cross-examine witnesses and did neither himself.

Yet again, Ms. Millhoff made her objection to the court's finding concerning petitioner's competence. This objection was made at the completion of the trial proceeding and against petitioner's express wishes. In fact, throughout the proceedings, petitioner insisted that he was competent. As we shall see, the trial judge, for the first time, provided counsel and petitioner with his views in explanation of his denials of Millhoff's motions. (T. vol. IV, 367.)

Petitioner was convicted on all counts. He was sentenced to six years based on the two firearm specifications and was given a cumulative sentence ranging from 15 to 385 years for the other counts. An appeal was filed on behalf of petitioner challenging the decision that he was competent to stand trial. The Ninth District Court of Appeals affirmed his conviction. Petitioner's appeal to the Ohio Supreme Court was dismissed because the court felt that no constitutional question existed. In 1989, new counsel for petitioner filed to renew

his appeal based on additional statements of error. This appeal was denied based on the fact that he already had one appeal. The Ohio Supreme Court also upheld this decision.

Petitioner now seeks habeas corpus on six grounds.

1. Petitioner's federal constitutional rights to due process and effective assistance of counsel are denied when he is tried while legally incompetent to stand trial.

2. Petitioner was denied the federal constitutional right to the effective assistance of appellate counsel.

3. Petitioner was denied his federal constitutional right to due process and the effective assistance of counsel when the trial court failed to properly determine on the record whether petitioner was knowingly, intelligently and voluntarily waiving his right to counsel.

4. Petitioner's federal constitutional right to a fair trial was denied when the trial court failed to instruct the jury on the degree of proof necessary to sustain a conviction for the firearm specifications.

5. Petitioner's federal constitutional rights to due process and a fair trial were denied when he was convicted of two firearm specifications although there was insufficient evidence to prove him guilty beyond a reasonable doubt.

6. Petitioner's Fourteenth Amendment right to a fair trial is denied when the trial court admits identification evidence obtained as a result of unduly suggestive pretrial procedures that tainted all in-court identifications.

Magistrate Judge Gallas, to whom this matter was referred for Report and Recommendation, reviewed the trial record and has given us his views concerning the issues raised here by petitioner. Magistrate Judge Gallas found that petitioner was not denied due process or effective assistance of trial counsel due to mental incompetence. The Magistrate Judge reached this conclusion after conducting an independent review of the evidence because he found that the trial court's finding was not entitled to a presumption of correctness. Briefly put, Magistrate Judge Gallas also found that the trial was not tainted by unduly suggestive pretrial identifications; that petitioner did establish that he was denied the effective assistance of appellate counsel; and that petitioner's convictions of the firearm specifications should be dismissed because of insufficient evidence by reason of the trial court's failure to instruct the jury on these charges.

First, petitioner objects to the Magistrate Judge's finding, that he was not denied effective assistance of counsel and due process based on his mental incompetence. Petitioner specifically objects to the manner in which the trial judge handled the psychologist's report. Second, petitioner objects to the Magistrate Judge's conclusion that the failure to raise certain other issues on direct appeal did not constitute ineffective assistance of appellate counsel. Third, petitioner contends that he was denied due process and effective assistance of counsel because the court did not determine on the record whether his decision to waive counsel and proceed *pro se* was knowing, intelligent and voluntary. And finally, petitioner objects to the Magistrate Judge's determination that the trial was not tainted by unduly suggestive pretrial identifications.

Respondent also objects to the Magistrate Judge's report. Respondent argues, first, that failure to make a contemporaneous objection to a jury instruction is not reviewable as plain error. Second, respondent contends petitioner's appellate counsel was not ineffective because it failed to argue that the above-mentioned instruction was insufficient. Third, respondent argues that the Magistrate Judge erred in finding appellate counsel ineffective because counsel omitted a meritorious claim and that prejudice occurred. Finally, respondent challenges the Magistrate Judge's finding of ineffective appellate counsel based on the claim of insufficient evidence to support the firearm specifications.

In reviewing objections to a Magistrate Judge's report and recommendation on a motion for a writ of habeas corpus, this

court must exercise *de novo* review. 28 U.S.C. § 636(b)(1)(B). *See also Flournoy v. Marshall*, 842 F.2d 875, 877 (6th Cir. 1988) *aff'd* 880 F.2d 414 (1989).

## LAW AND ANALYSIS

### I. *Exhaustion.*

■■■ Before a federal court will grant a writ of habeas corpus, petitioner must exhaust all available state court procedures. To be exhausted, "the federal claim must be fairly presented to the state court," *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *see also Anderson v. Harless*, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982), if state proceedings remain available in which the issue can be raised. Petitions containing both exhausted and unexhausted claims must be dismissed. *Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 1205, 71 L.Ed.2d 379 (1982). Respondent claimed that petitioner did not exhaust all of his remedies regarding the claim of ineffective assistance of appellate counsel.

Petitioner's appeal to the Ninth District Court of Appeals articulated three assignments of error:

1. The lower court erred in finding appellant competent to stand trial where the only medical opinion submitted to the court was that he was incompetent, and where the appellant's continued irrational behavior and demeanor clearly supported the psychologist's opinion that he was incompetent.

2. The lower court erred in failing to find appellant incompetent to stand trial where the issue was properly raised throughout the trial and [the] court had before it prior medical opinion of incompetency along with supporting evidence consisting of appellant's irrational behavior at trial and his demeanor during trial.

3. Appellant's right to due process of law was violated where he was tried, convicted and sentenced while legally incompetent.

The court overruled each assignment of error. Each is fact based; dependent for its validity on the eventual factual finding of the trial court.

Petitioner next sought a hearing by the Ohio Supreme Court on a single assignment of error:

1. The court erred in finding appellant competent to stand trial where appellant was incapable of assisting in his own defense and where the only objective evidence submitted to the court was that of a medial report which concluded that appellant was incompetent, resulted in a violation of appellant's due process right as guaranteed by the Fourteenth Amendment.

This motion was *sua sponte* dismissed because "no substantial constitutional question exists herein."

Based on the alleged ineffective assistance of his appellate counsel, petitioner sought reinstatement of his appeal before the Ninth District Court of Appeals on additional assignments of error:

1. The failure of the trial court to conduct an inquiry into whether appellant knowingly, voluntarily and intelligently waived his right to assistance of counsel violated appellant's right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

2. The trial judge erred in failing to instruct the jury on the firearm specifications in counts sixteen and seventeen. Said error violated appellant's right to due process of law guaranteed by the Fourteenth Amendment to the United States Constitution and Article One, Section Ten of the Ohio Constitution.

3. The evidence adduced at trial was insufficient to support a finding of guilty to the firearm specifications in counts sixteen and seventeen. Said error deprived appellant of his Fourteenth Amendment right to due process of law.

4. It was error for the trial judge not to instruct the jury on the elements of robbery in counts sixteen and seventeen where the evidence adduced at trial clearly supported such a verdict. Said error deprived appellant of a fair trial as guar-

anteed by the due process clause of the Fourteenth Amendment and Article One, Section Ten of the Ohio Constitution.

5. The identification procedures used by the police were so unduly suggestive that it was error for the court not to suppress the identification by victims, Wheeler, Wolfe and Kalbaugh. The unduly suggestive procedures tainted all future identifications and denied appellant his Fourteenth Amendment right to a fair trial.

Citing the fact that the Ninth District had already affirmed the conviction once, and the Ohio Supreme Court dismissed an appeal once, the Ninth District denied reconsideration.

As a last step, petitioner appealed the Ninth District's decision to the Ohio Supreme Court citing six errors:

1. When there is a reasonable probability that but for appellate counsel's failure to raise issues on appeal, the result of appellant's direct appeal would have been different, appellant is denied the effective assistance of appellate counsel.

2. When a defendant indicates a desire to proceed to trial pro se, a trial judge must determine on the record that defendant is knowingly, intelligently and voluntarily waiving his right to counsel.

3. In order for a defendant to be convicted and sentenced to three years of actual incarceration for a firearm specification under R.C. Section 2929.71, the indictment must contain a specification that the offender had a firearm on or about his person or under his control.

4. Before a defendant can receive three years actual incarceration for a firearm specification under R.C. Section 2929.71, the trial judge must instruct the jury on the degree of proof required to sustain a conviction for the firearm specification, separate and apart from the instructions on the underlying offense in which the firearm was allegedly used.

5. To prove a firearm specification beyond a reasonable doubt, the State must prove that the defendant had a deadly weapon on or about his person or under his control while committing a felony, that the deadly weapon was a firearm as defined by R.C. Section 2923.11(B), and that the firearm was operable.

6. A defendant is denied his Fourteenth Amendment right to a fair trial when the trial court admits evidence of an unduly suggestive showup that tainted the in-court identifications of several prosecution witnesses.

This appeal was also dismissed *sua sponte* for want of a "substantial constitutional question."

■ It is clear that many issues which were raised in the motions to reinstate the appeal were not raised in the original direct appeals. The unwillingness of the Ninth District and the Ohio Supreme Court to hear the merits of these claims does not, however, preclude a finding of exhaustion. "To exhaust his or her remedies, a petitioner for federal habeas corpus relief is only required to raise his claims before the state's highest court." *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir.1990). The critical question is whether the Ohio Supreme Court "had a full and fair opportunity to consider the claims raised." *Id.*

■ Respondents contend that petitioner failed to raise ineffective assistance of appellate counsel in a way consistent with Ohio law, so that petitioner must raise it in another post-conviction action to exhaust the claim for federal habeas corpus purposes. As authority, respondent cites the *Manning* court's conclusion that a § 2953.21 petition was a proper way to initiate an ineffective assistance of appellate counsel claim.[1]

---

1. Ohio Revised Code § 2953.21 provides in pertinent part:

(A) Any person convicted of a criminal offense or adjudged delinquent claiming that there was such a denial or infringement of his rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States, may file a petition at any time in the court which imposed sentence, stating the grounds for relief upon, and asking the court to vacate or set aside the judgment or sentence or to grant other appropriate relief. The petitioner may file such

Respondent's reliance on *Manning* is now outdated. After the briefing on this case, the Ohio Supreme Court held, "[c]laims of ineffective assistance of appellate counsel are not cognizable in postconviction proceedings pursuant to R.C. 2953.21." *State v. Murnahan*, 63 Ohio St.3d 60, 584 N.E.2d 1204, syllabus ¶ 1 (1992). Recognizing that ineffective assistance of appellate counsel may not be immediately apparent, the Ohio Supreme Court went on to hold:

> a delayed claim of ineffective assistance of appellate counsel must first be brought in an application for delayed reconsideration in the court of appeals where the alleged error took place, pursuant to App.R. 26 and 14(b), and if delayed reconsideration is denied then the defendant may file for delayed appeal in the Supreme Court.

*Id.* at syl. ¶ 3.

Petitioner has satisfied the procedure described by the Ohio Supreme Court for properly raising a claim of ineffective assistance of counsel. Respondent's suggestion that petitioner presented a mixed petition of exhausted and unexhausted claims is incorrect. Respondent apparently concedes this issue since no objection was lodged as to this finding in the Magistrate's report.

Thus, we may pass to and consider the merits of petitioner's claims. In doing so it is well to state a general view. In reviewing the contentions of petitioner, this court perceives three major themes. Did the April 8 competency hearing deprive petitioner of his right to procedural due process; did the trial judges's determination concerning petitioner's competency deprive him of some right to substantive due process; was petitioner deprived of his Sixth Amendment right to counsel because he did not knowingly, intelligently and voluntarily waive his right to counsel? It is apparent that these questions are inextricably intertwined.

We note, as well, that this court's view of the proceedings which are now the subject of scrutiny must be different, insofar as analysis is concerned, than the view of the state appellate courts. The appeals there, as has been noted, are fact based. The appellant there said that based on the facts before him, the trial judge erred in his decision making. Here the view is one in which petitioner questions the nature of the hearings, the parameters of the fact finding process and its result as measured in a Constitutional context.

## II. *Competency to Stand Trial*

We begin with an examination of what may be seen as the common thread linking all of the issues. The requirement of competence through all stages of trial has ancient and respectable historic antecedents. *See* 4 William Blackstone, *Commentaries* \*24–25. Beyond concern over fairness, trying incompetents invokes the law's disfavor of trials in absentia. *Drope v. Missouri*, 420 U.S. 162, 171, 95 S.Ct. 896, 903, 43 L.Ed.2d 103 (1975). Also, "[the] spectacle of the trial of an incompetent defendant diminishes society's respect for the dignity of the criminal justice process." Benjamin J. Vernia, Note, *The Burden of Proving Competence to Stand Trial: Due Process at the Limits of Adversarial Justice* 45 Vand.L.Rev. 199, 201 (1991) (citing *Freeman v. People*, 4 Denio 9, 20 (N.Y.Sup.Ct. 1847)).

The requirement of competence is often expressed as the right to assist in one's own defense. This right is as important to our notions of fairness and justice as is the presumption of innocence. *United States v. Helmsley*, 733 F.Supp. 600, 605 (S.D.N.Y.1989) (stating that conviction would be defective, "not because there may be no evidence of guilt, but rather because the defendant would have been denied a fundamental right that must always be available to all defendants.") Competency to stand trial is an aspect of substantive

---

supporting affidavit and other documentary evidence as will support his claim for relief.

\* \* \* \* \* \*

(G) If the court finds grounds for granting relief, it shall enter a judgment that vacates

and sets aside the judgment in question, and, in the case of a prisoner in custody, shall discharge or resentence him or grant a new trial as may appear appropriate. \* \* \*

due process. *Lafferty v. Cook,* 949 F.2d 1546, 1550 (10th Cir.1991), *cert. denied* ——— U.S. ———, 112 S.Ct. 1942, 118 L.Ed.2d 548 (1992).

The Fourteenth Amendment prohibition against deprivations of liberty without due process of law is triggered in two different ways. First, citizens are guaranteed due process regarding rights which are encompassed by the substantive provisions of the Due Process Clause. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983). As previously discussed, competency to stand trial is a right afforded within the umbrella of substantive due process. Second, citizens are guaranteed due process regarding certain state laws. "[W]here a statute indicates with 'language of an unmistakable mandatory character,' that state conduct injurious to an individual will not occur 'absent specified substantive predicates,' the statute creates an expectation protected by the Due Process Clause." *Ford v. Wainwright,* 477 U.S. 399, 428, 106 S.Ct. 2595, 2611, 91 L.Ed.2d 335 (1986) (O'Connor, J., concurring).

■ In Ohio, the protection of competency to stand trial is provided by statute. Revised Code § 2945.37 provides in pertinent part:

(A) In a criminal action in a court of common pleas or municipal court, the court, prosecutor, or defense may raise the issue of the defendant's competence to stand trial. If the issue is raised before trial, *the court shall hold a hearing on the issue* as provided in this section....

A defendant is presumed competent to stand trial, unless it is *proved by a preponderance of the evidence in a hearing* under this section that because of his present mental condition he is incapable of understanding the nature and objective of the proceedings against him or of presently assisting in his defense.

. . . . .

The court shall conduct the hearing within thirty days after the issue is raised, unless the defendant has been referred for examination under section 2945.371 of the Revised Code, in which case the court shall conduct the hearing within ten days after the filing of the report by that section. A hearing may be continued for good cause shown.

The defendant shall be represented by counsel at the hearing. If the defendant is unable to obtain counsel, the court shall appoint counsel under Chapter 120 of the Revised Code before proceeding with the hearing.

The prosecutor and defense counsel may submit evidence on the issue of the defendant's competence to stand trial. A written report made under section 2945.-371 of the Revised Code may be admitted into evidence at the hearing by stipulation of the prosecution and defense counsel....

*Upon the evidence submitted, the court shall determine the defendant's competence to stand trial and shall make an order* under section 2945.38 of the Revised Code.

R.C. § 2945.37 (emphasis added). Section 2945.38, in relevant part, provides, "If the court finds, upon the hearing provided for in section 2945.37 of the Revised Code, that the defendant is competent to stand trial, he shall be proceeded against as provided by law." R.C. § 2945.38(A). The above-quoted statutes create an expectation protected by the Due Process Clause.

■ When applying these statutes, Ohio courts do so under the standard enunciated by the Supreme Court in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam). *See e.g., Ohio v. Marshall,* 15 Ohio App.3d 105, 107, 472 N.E.2d 1139 (Cuyahoga Cty.1984). The *Dusky* standard provides:

it is not enough for the district judge to find that 'the defendant [is] oriented to time and place and [has] some recollection of events,' but that the test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding— and whether he has a rational as well as factual understanding of the proceedings against him.

*Dusky,* 362 U.S. at 402, 80 S.Ct. at 788. This standard not only applies to district courts trying cases, it applies in federal habeas corpus review of state proceedings as well. *Drope,* 420 U.S. at 174, 95 S.Ct. at 905.

Competency is an underlying predicate to due process. The right to cross-examine witnesses or confront one's accusers would mean little if one were not possessed of a rational understanding of the proceedings. A duty devolves upon the trial court to investigate a defendant's competence whether or not either party makes a motion raising the issue. A judge with a "bona fide" doubt about a defendant's competence must, *sua sponte,* hold a competency hearing to investigate the defendant's "rational understanding." *Pate v. Robinson,* 383 U.S. 375, 385, 86 S.Ct. 836, 842, 15 L.Ed.2d 815 (1966).

 Competency issues are resolved in proceedings separate from the main trial so that the competency determination remains "uncluttered by evidence of the offense itself." *Martin v. Estelle,* 546 F.2d 177, 179 (5th Cir.), *cert. denied,* 431 U.S. 971, 97 S.Ct. 2935, 53 L.Ed.2d 1069 (1977). *See also Brandon v. Texas,* 599 S.W.2d 567 (Crim.App.1979). While other jurisdictions have followed the common law practice of jury trials, those such as Ohio now entrust the competency decision to the sound judgment of the judge. *See* 45 Vand.L.Rev. at 203–04. Whatever procedure is applied by the state, that procedure must be adequate to protect defendant's due process right not to be convicted while incompetent. *Pate,* 383 U.S. at 378, 86 S.Ct. at 838. In so stating, this court refers to both the hearing process and, as well, findings acquired through the inquiry made. If the methodology of the hearing may be said to represent procedure, and if the findings garnered by virtue of that hearing may be said to represent substance, then here form and substance merge to give definition to petitioner's right to due process.

Thus, in reviewing petitioner's motion, the court will first consider whether the hearing provided was procedurally adequate to protect petitioner's substantive due process rights and state-created expectation. Second, the court will consider whether or not the result of the hearing violates petitioner's substantive due process right.

A. Procedural Due Process.

At the outset, it is important to note what is not involved in this case. The question of when a hearing is required is not implicated because a hearing was actually held. The question of when a defendant is entitled to evaluation by a court-appointed expert is also not at issue inasmuch as defendant was evaluated and an evaluative report submitted. Instead, the fundamental question before the court is the *sufficiency* of the procedures followed in the competency hearing as those procedures are dictated by constitutional protections and the state statutory scheme.

 In conducting habeas corpus review, "a federal evidentiary hearing is required unless the state-court trier of fact has after a full hearing reliably found the relevant facts." *Townsend v. Sain,* 372 U.S. 293, 312–13, 83 S.Ct. 745, 756–57, 9 L.Ed.2d 770 (1963). The presumption of correctness codified in the habeas corpus statute follows this approach. 28 U.S.C. § 2254(d) provides in relevant part:

a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear ...

. . . . .

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing

. . . . .

(6) that the applicant did not receive a full, fair and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceedings.

The adequacy of state procedures is directly linked to the circumstances and interests at stake. *Ford v. Wainwright*, 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986). The court must therefore determine whether the competency hearing before the state trial court satisfied the constitutional minima for a competency hearing both as a protection for a substantive due process right and as a protection for the state-created expectation.

### 1. *Minimum Hearing Standards.*

Courts must consider mental state in a variety of legal contexts. Insanity may be a defense to criminal liability. Posing a danger to oneself or society is a predicate to involuntary commitment. In capital cases, questions concerning a person's mental capacity may also arise after conviction because incompetent persons may not be executed. How is competency or lack thereof to be ascertained? The statutory scheme mandates a hearing. Our first discussion involves the nature of that process.

The Supreme Court discussed the due process requirements for determination of pre-execution competence in *Ford v. Wainwright*. Historically, the justification for not trying incompetents was closely related to the justification for not executing incompetents. *See Ford*, 477 U.S. at 406–07, 106 S.Ct. at 2600 (discussing historic antecedents, including the quotation from Blackstone cited above). In the view of this court, an analysis of the opinions of the plurality and the concurring justices in *Ford* strongly suggests an analogy between what is called for in a pre-execution competency hearing and all pretrial competency hearings.

In his concurrence, for instance, Justice Powell noted that the fact of conviction and sentencing necessarily evidences that the defendant was either formally found competent in a hearing or competency was sufficiently clear to not raise a doubt. *Id.* at 426, 106 S.Ct. at 2610 (Powell, J., concurring). Based on the prior explicit or implicit finding of competence, Justice Powell concluded that the State can presume the defendant's continued sanity and "require a substantial threshold showing of insanity merely to trigger the hearing process" discussed in *Ford. Id.* Justice Powell referred to the "clear and convincing" standard necessary to overcome the presumption of sanity applied against states in involuntary commitment hearings, implying that this standard may also be appropriately applied when a prisoner seeks to overcome the presumption of sanity which arises from the fact of conviction. *Id.* at fn. 6 (citing *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). But it is clear that Powell's analysis depends on the reliability and accuracy of the pretrial competency determination.

Since post-conviction evaluations of competency to be executed could be denied on the basis of a pretrial finding of competency to stand trial, the pretrial competency hearing must at least afford defendant minimally that process which would be available before execution. In fact, Justice Powell acknowledged, "in the context of competency determinations, prior to execution, this standard is no different from the protection afforded by procedural due process." *Id.* at 424, 106 S.Ct. at 2609.

In *Ford*, the plurality identified two fundamental deficiencies of the Florida pre-execution process, which were relevant there and equally so here. First, the process must include the defendant in the truth-seeking process. *Id.* at 414, 106 S.Ct. at 2604. This condition is not unique to capital cases and is especially appropriate when resolving contested issues of mental state. *Id.* The plurality noted the wide disagreement among psychiatrists on mental illness and diagnosis and concluded that without "adversarial assistance from the prisoner's representative," substantially beneficial probative evidence may be lost, increasing the likelihood of error. *Id.*

Second, the process must afford defendants an opportunity to challenge and impeach psychiatric opinions. *Id.* at 415, 106 S.Ct. at 2604.

> Cross-examination of the psychiatrists, or perhaps a less formal equivalent, would contribute markedly to the process of seeking truth in sanity disputes by bringing to light the bases for each ex-

pert's beliefs, the precise factors underlying those beliefs, any history of error or caprice of the examiner, any personal bias with respect to the issue of capital punishment, the expert's degree of certainty about his or her own conclusions, and the precise meaning of ambiguous words used in the report. *Without some questioning of the experts concerning their technical conclusion, a factfinder simply cannot be expected to evaluate the various opinions, particularly when they are themselves inconsistent.* *Id.* (emphasis added).

The unwillingness of Justices Powell, O'Connor and White to join the plurality is traceable to the fact that *Ford* involved a post-conviction determination of an issue presumptively determined before and during trial. Nonetheless, Justices White and O'Connor noted, "due process at the very least requires that the decisionmaker consider the prisoner's written submissions." *Id.* at 430, 106 S.Ct. at 2612 (O'Connor, J., concurring).

Not only are these procedural components integral to protecting the substantive right not to be tried and convicted while incompetent, these components are implicit in Ohio's statutory scheme creating a state-based expectation in the same right. The Ohio statute explicitly requires a formal hearing. The statute also explicitly provides for the participation of defense counsel at the hearing. Evidence is to be submitted and the court is to issue an order with its ruling. These elements described in the statute are meaningless if the trial court is empowered to mute defense counsel and ignore evidence submitted by counsel in favor of opinions formulated by the trial court based on independent investigation. The expectation created by Ohio law will only be protected from arbitrary government action by affording defendants meaningful opportunities to present evidence and to cross-examine or challenge opposing evidence.

### 2. *The Trial Court Hearing.*

 Inasmuch as this court's analysis must focus on the contents of the trial court's pretrial competency hearing, it is necessary to scrutinize that hearing in some detail. After commencing in an ordinary way, petitioner's competency hearing quickly became very unordinary. In accord with Ohio law, counsel for both sides stipulated that had psychologist Reinhold testified, his testimony would have been consistent with the contents of the report. (T. vol. I, 10.) The trial judge asked both parties if they wished to submit additional evidence to which the prosecution said "No, your Honor." (*Id.*) Attorney Millhoff's answer, however, raised a whole new set of issues for the court's consideration: "No, your Honor. I feel I should indicate at this time that Mr. Lagway has indicated to me that he has filed a motion asking that I no longer represent him." (*Id.*)

Judge Reece asked petitioner to rise and began a discussion about petitioner's desire to replace Millhoff as his counsel. (*Id.* at 11.)

> Defendant: Well, I just basically would rather represent myself because I'm not in concurrence with this, the folly that's being brought against me in reference to competence. You know, you're bringing me before Court to see if I'm competence [sic]—I'm not a—in accordance with that, I gave no permission for that to even come about. I wish to know who submitted, you know, the complaint for me to come before a competency hearing.

(*Id.*) The trial judge explained that the issue arose through petitioner's own conduct and then asked petitioner if he thought he was competent.

> Defendant: Yes, definitely. I'm not, you know, you say one thing that this will come to trial. I have never stopped this from trying to come to trial. It seems that the Courts is what's the one. I'm saying that I want universal law, and you're saying you want me to give Caesar what is his. I'm saying I'm not Caesar, so you all do what you want to do with this flesh. I'm saying you can go on with your own proceedings, you know.

(*Id.* at 12.) From this point, the judge and the petitioner engaged in a free-flowing colloquy covering a range of subjects—some directly related to Ms. Millhoff's sta-

tus in the case, some related to petitioner's desire to proceed *pro se* and some relating to petitioner's factual understanding of the proceedings.

Court: Do you know what setting this is?

. . .

Defendant: Conscious execution or conscious oppression. I cannot suppress myself. I can't adhere to my Father's law because it don't exist, you know. This foundation is built around evil. You have no right to sit there and wear that black suit and judge me. I don't call you a judge. I call you elder because you are my elder, but that's it and this is what I'm trying to express with the Courts, but, you know, I'm saying, you know, like come at me face value. I'm saying I don't want the mark, I don't want nothing you have to offer, you know. This is what I'm trying to express. I don't want to battle with you or nothing like that. I'm saying that I don't want anything Satan has to offer. I'm not going to be in accordance with Satan's rules here on earth. I denounce him and his kingdom. You are part of his kingdom because you have no right to judge me.

. . .

And, you know, your lawyers on both sides, they're agents for you. You call— I took an attorney on the basis that you called me an attorney, you know, but you call somebody who is not willing represent me and recognize my plight, you know, how is she—can she righteously represent me if she has her own norms to adhere.

(*Id.* at 13–14.) The interview between the trial judge and petitioner included soliloquies by petitioner on the kidnap and rape of his people by society, oncoming Armageddon, and his inability to participate in the trial because that would compromise him before his "Father" and destroy his spirit. (*Id.* at 15–19.)

Petitioner concluded:

Just run me through the Courts, run me through your little mental institutions to the pen, do it, but don't, you know, disrespect me and take me by running

through this little ceremony you all been having every day, you know, you offer as far as being practitioners of sin, cause you do it for money every day. When the people in society, you know, they become victims of society, they're not practicing evil.

(*Id.* at 19.)

The judge periodically redirected petitioner's discourse, not necessarily to the subject immediately before the court, Ms. Millhoff's ongoing role in the case, but sometimes to the overarching reason for the hearing, petitioner's competency.

Court: All right. Do you want to go to trial or not?

Defendant: No. I'm saying do what you feel deemed, worship your God, if you worship him the same that I am, then you will recognize my plight, but if you're not, then do what your God inspires you to do.

(*Id.* at 22.)

Somehow, the gist of the colloquy again shifted, this time to resolving petitioner's desire to have access to the prosecution's evidence. Concurrently, Judge Reece also seemed to be inquiring about petitioner's desire to proceed without any attorney. Asked about what he would do with witnesses' reports, petitioner responded:

We go to trial, at least I get a chance to look at the truth and the lie, cause I'm not going to sit up there—I'm not going to—I'm not going to challenge anybody too much on the witness stand.

\* \* \* \* \* \*

. . . If they feel as though I have wronged them, whoever it is, if it is going to please them to do to me what they want to do, then I'm all for it. If they—if they can get whatever they want on their shoulder off.

\* \* \* \* \* \*

I will know all. I'm not going to challenge them on the stand.

(*Id.* at 33.) Eventually, petitioner asked, "So I can't go—can I go *pro per* ?" (*Id.* at 33.) The judge responded, "Yes, I'll let you talk if you want to talk." (*Id.*) He then denied the motion to withdraw Attor-

ney Millhoff but did permit petitioner to represent himself as co-counsel in the case. All of this was done without soliciting any comment or argument from counsel. Of materiality to this court is the fact that the trial judge made determinations about self-representation and Sixth Amendment waiver *before* resolving whether petitioner was even competent to stand trial.

Following this decision, however, the judge returned to his interrogation to determine petitioner's competence.

Court: What is my job?

Defendant: I guess to serve, to serve manna.

Court: How did you figure I'm going to do that?

Defendant: You know, you got more at stake than me. I'll admit it is harder for you than me. I don't have nothing.

. . . . .

It would be hard for me to determine, you know. If there is no telling what spirit you might be moved by, I mean goodness might take you over, anything, you know, mystery of my Father.

. . . . .

I know, I can judge pretty much as far as apparatus. You work from—if I put a percentage of it, is the percentage is going to be evil. To say for definite, I can't really say.

(*Id.* at 43–44.)

As a result of all of this discourse, the trial court stated its opinion that petitioner was competent to stand trial. *See supra* p. 4.

### 3. *Procedural Due Process Analysis of the Competency Hearing.*

It is this court's opinion that petitioner's competency hearing failed to satisfy either of the requirements enunciated in *Ford, supra,* for an adequate competency proceeding.

#### a. Participation in Truth-seeking.

 As noted in the reconstruction of the competency hearing, Attorney Millhoff submitted the report of a court-appointed psychologist which explicitly stated that petitioner was *not* competent to stand

trial. This report was not challenged or contradicted by the prosecution or the court. At such time as the trial judge inquired concerning whether the parties had any other evidence which they desired to submit, not only did the preponderance of the evidence tend to support a finding of incompetence, *all* of the evidence pointed clearly to incompetence. To the trial judge, apparently, the close of formal submission of evidence was not, however, the close of the truth-seeking process. He himself, an experienced, seasoned and perceptive jurist, engaged in a substantial investigation of his own—so substantial, in fact, that he seems to have ignored the report and made his ruling based upon his own impressions. There is no doubt that the trial judge's impressions raised as a result of his lengthy conversation with petitioner played a highly meaningful part in reaching his decision on the competency issue. Such impressions form a meaningful part in all such decisions. In law, they can not be the *only* basis for such decisions.

Furthermore, due process should extend to *all* meaningful parts of the truth-finding process. While, in matters such as this, judges properly have discretion to exercise independent judgment, that discretion does not include the ability to foreclose participation by the defendant's representative at a meaningful stage of the process. Extending such power to judges would blunt the adversarial process on which the criminal justice system depends for reliability and accuracy.

Beyond such critical but perhaps abstract concerns, it seems clear that Attorney Millhoff may have had significant experiences to relate to the court based on her two meetings with petitioner. These experiences certainly would have been relevant to the central question of whether petitioner could rationally assist counsel. Ms. Millhoff's personal contact with petitioner on two separate occasions, if nothing else, would have helped to put the trial court's hour-long colloquy with petitioner into some, more complete, context. This probative evidence was lost because the court ruled without soliciting any additional evi-

dence from Ms. Millhoff and before she had an opportunity to inject argument, evidence or objection.

### b. Cross–Examination.

Opinions in cases involving the use of psychological experts display a clear recognition of the subjective component of such testimony. *See e.g., Medina v. California,* — U.S. —, —, 112 S.Ct. 2572, 2580, 120 L.Ed.2d 353, 367 (1992) ("Our cases recognize '[t]he subtleties and nuances of psychiatric diagnosis render certainties beyond reach in most situations' because '[p]sychiatric diagnosis ... is to a large extent based on medical 'impressions' drawn from subjective analysis and filtered through the experience of the diagnostician.'" (quoting *Addington,* 441 U.S. at 430, 99 S.Ct. at 1811)). Cross-examination, or even a less formal equivalent, performs the special function of revealing strengths and weaknesses in expert psychological testimony. In an area where professionals may be susceptible to personal bias, error, uncertainty and ambiguity, a judge engaged in independent, quasi-expert, investigation and diagnosis can be no less susceptible to error.

■ At the very least, a judge who formulates his own 'expert' opinion should explain what was discovered factually and how he analyzed those facts. Defendants should be given an opportunity to respond to the judge's findings and diagnosis. Only by doing this will the judge further the exposition of the truth because the defendant will have an opportunity to suggest ways in which the judge's conclusion, like the conclusion of any psychological expert, is in error. The fact that petitioner himself voiced his view that he was competent and the fact that he did not contest the court's opinion on that subject is, first, not surprising and second, does not cure the failure of the trial court to afford appropriate hearing opportunities.

The trial judge here substituted his own psychological expertise for that of his court-appointed expert without any testimony concerning Reinhold's technical conclusions. The record is devoid of any explanation of how the judge evaluated the report and why he apparently dismissed it as valueless. It may be that the court saw the words and ideas of petitioner to be manipulative. One suspects this may have been the rationale behind the judge's ruling. But to rule on the issue without reference to the report and without hearing from counsel for defendant in some meaningful way precludes even minimal procedural protections. It would appear, in short, that the trial judge foreclosed the essence of the fact-finding process, disregarded without voiced reason the Reinhold report, and depended upon his own opinions, gained from his conversations with petitioner, to reach the ultimate decision in question.

### c. Conclusion.

In conducting a competency hearing, a judge has certain obligations which flow from the requirement that defendants must have "an opportunity to be heard." This court is cognizant of the challenge involved in conducting an interview such as the one above-described. Under the circumstances, it was no doubt very difficult for the trial judge to maintain his own focus, let alone keep the petitioner focussed. Yet, it is imperative that the judge impose some cognizable structure on the proceeding to afford counsel the opportunity to participate. To do less renders the right to counsel nugatory and calls into question the reliability of the decision.

The judges's obligation to provide this defendant with an adequate opportunity to present evidence is even more pressing in states like Ohio where defendants have the burden of proving incompetence by a preponderance of the evidence. Petitioner's competency hearing did not meet the standards for procedural due process. The pretrial competency hearing lacked those elements so essential to the determination of truth. Petitioner's representative was unable to forward additional evidence or arguments bearing on the issue of petitioner's competence because the ruling on competency and its *ratio decidendi* were woven into the tapestry of the colloquy between petitioner and the trial judge and because the latter substituted his judgment

for the judgment of the court's expert without notice or preamble. Under these circumstances, the state findings are entitled to no presumption of correctness.

■ Having found the competency hearing procedurally insufficient, it would be inconsistent for this court to independently evaluate petitioner's competence to stand trial based on the record. The second option available to the court is a *nunc pro tunc* evidentiary hearing to determine whether, over eight years ago, petitioner was in fact competent to stand trial. The Supreme Court rejected this option in *Pate* because of the inherent unreliability of such a hearing only six years after the fact. *Pate*, 383 U.S. at 387, 86 S.Ct. at 843. The Supreme Court again took that position in *Drope*. *Drope*, 420 U.S. at 183, 95 S.Ct. at 909. The only viable option available to the court is to grant petitioner's writ and vacate the conviction and sentence.

B. Substantive Due Process.

■ Even were we to conclude that petitioner's competency hearing did satisfy procedural requirements, the result is not entitled to a presumption of correctness. The presumption is not applicable if the factual determination was not "made under a correct view of the law." *Lafferty*, 949 F.2d at 1550.

Whether or not the trial judge in this instance applied the correct law is difficult to ascertain inasmuch as he did not refer to any standard or legal rule which he applied. Based on the trial court's disposition of a fundamental element of due process, the court is compelled to infer the test applied from the record of the trial court hearings. This court also considers subsequent comments by Judge Reece to the extent they may illuminate the otherwise observed judicial reasoning applied on April 8.

The competency ruling appears to have as its cornerstone the fact that the trial judge found that petitioner had a factual understanding of the proceedings. The record suggests that the court placed substantial reliance on sections of the judge-petitioner discourse in which petitioner described the function of the judge, jury and prosecution.

Three things are conspicuously absent from this ruling. First, the judge never asked Attorney Millhoff for any description of her two meetings with petitioner. He made no inquiry concerning the most likely source of probative evidence on the central issue at a competency hearing—the ability of the accused to consult rationally with counsel. Neither did he seem to consider the ability to consult with counsel in his April 8 ruling.

Second, and importantly, while the court's ruling addresses petitioner's factual understanding, no mention is made of whether this understanding is rational. Petitioner's response to Judge Reece's only direct question to petitioner about his ability to assist counsel was facially, at least, incoherent and that subject was not discussed again. The ruling can be fairly said to be violative of the teachings of *Dusky;* it indeed applied a test explicitly disapproved by that opinion. This court's view is buttressed by the trial judge's subsequent ruling on competence: "[I]n my dialogue personally with the Defendant, I am persuaded that he did and does understand the nature of the proceedings, that he did and that he does understand the nature and extent of the charges against him." (T. vol. IV, 367.) In short, while Judge Reece found factual knowledge, he never remarked on whether petitioner also had *rational* knowledge.

Third, the court's total absence of comment on the expert's report is conspicuous. The report directly addresses whether or not petitioner is rational. Thus, the judge's failure to make any reference to the report supports one of two conclusions. The first is that the trial judge was engaged in seeking only a factual awareness upon which to base the finding of competency. Of course, he logically might still have referenced the report because the report does support a finding of only factual awareness.

Alternatively, according to the record, the trial judge chose to ignore the objective opinion of a court-appointed expert and substitute his own personal subjective judgment. Such an interpretation is not inconsistent with the court's final ruling on petitioner's competence.

> Well, for the record, I recognize that my ruling in this matter is contrary to the finding of the Summit County Psycho–Diagnostic Clinic, whose conclusion was that Mr. Lagway was not competent to stand trial. However, the law provides that the Court is the one who is to make final decision on the matter and I do believe that there are times and situations where the Court is in a better position to make the overall judgment on the matter than even the psychologist and perhaps, in some cases, the psychiatrist. It has been my considered opinion from the time the issue was first raised that this Defendant was competent to stand trial.

*Id.*

■■■■■■ While Judge Reece is surely correct that competency is a legal conclusion to be resolved by an independent judgment of the court, *United States v. Makris*, 535 F.2d 899, 908 (5th Cir.1976), the resolution cannot be reached by disregarding an expert opinion. "It is well-settled that expert opinion is not binding on the trier of fact *if there is reason to discount it.*" *Id.* Other than the trial judge's apparent belief that he was better able to evaluate petitioner's state of mind, "from the time the issue was first raised," the record at the first hearing is devoid of any reason to discount the report.

> The question of competency calls for a basically subjective judgment.... [T]he competency determination depends substantially on expert analysis in a discipline fraught with subtleties and nuances. Consequently, it is this Court's job to weigh the evidence and determine questions of credibility. Faced with a record that supports conflicting inferences, this Court must consider the opinions of the psychiatric experts in light of the surrounding circumstances and determine which opinion is more realistic and

credible given the evidence presented. Further, in considering competency, the Court may rely on, in addition to expert testimony, lay witness testimony concerning the Petitioner's rational behavior, and cross-examination of Petitioner's expert.

*United States v. Rigatuso*, 719 F.Supp. 409, 416 (D.Md.1989). *See also, Bundy v. Dugger*, 675 F.Supp. 622, 634 (M.D.Fla. 1987), *aff'd*, 850 F.2d 1402 (11th Cir.1988). The cases do not invite circumstances in which the trial judge is called upon to decide the competency issue by using only his own impressions. Indeed, one can reason that the Ohio law providing for not one, but up to three evaluations, echoes that view. R.C. 2945.371(A).

■■■■■ Courts have considered the balance between expert testimony of mental incapacity and lay testimony of capacity.

> A defendant is not entitled to a judgment of [incapacity] simply because he offers expert testimony on the issue of insanity and the Government attempts to rebut it without any expert witnesses.

> The expert's opinion, even if uncontradicted, is not conclusive. At the same time, it may not be arbitrarily ignored, and some reason must be objectively present for ignoring expert opinion testimony.

*United States v. Hall*, 583 F.2d 1288, 1293–94 (5th Cir.1978) (even in this case, the lay testimony did not originate from, nor was it solicited by, the presiding judge.) *See also United States v. Mota*, 598 F.2d 995, 999–1000 (5th Cir.1979), *cert. denied*, 444 U.S. 1084, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980). Objective reasons for ignoring an expert report include:

> (1) the correctness or adequacy of the factual assumptions on which the expert opinion is based;

> (2) possible bias in the expert's appraisal of the defendant's condition;

> (3) inconsistencies in the expert's testimony, or material variations between experts; and

> (4) the relevance and strength of the contrary lay testimony.

*Strickland v. Francis,* 738 F.2d 1542, 1552 (11th Cir.1984). In the instant cause, the trial judge failed to describe *any* objectively present reason for ignoring the report, injecting into the hearing process at least a suggestion of arbitrariness.

 The record does not support a finding that any of the factors justifying disregarding a report were present. While the expert report was not based on a formal competency screening test because petitioner refused to cooperate, this fact does not make the report *per se* unreliable. The report clearly indicates that additional information was available through the Psycho–Diagnostic Clinic. The trial judge neither requested the additional information nor tried to examine Mr. Reinhold. There is no evidence that the report lacked an adequate factual basis or that Mr. Reinhold made extreme or unconventional assumptions.

 Since the psychologist was appointed by the court, his neutrality should be assumed absent specific evidence to the contrary. But again, there is simply no evidence on the record. The report seems to state that petitioner had factual understanding but that this understanding was not rational. These conclusions are not only not inconsistent logically, they are perfectly consistent with the kinds of cases which the *Dusky* test was formulated to protect. Finally, the only other testimony was petitioner's own protestations that he was competent. Judge Reece never discussed the petitioner's statements in light of the expert's report; but it is difficult to imagine how he could have found the statements inconsistent with Mr. Reinhold's conclusions that petitioner could not conceptualize the proceedings because he wanted to go to prison. Instead, the thrust of the trial judge's explanation is that his expertise was greater than that of his appointed expert and while, in the abstract, that may be so, the judge's personal valuation of his own expertise is not lay testimony, which may be used to impeach the conclusions reached in the Reinhold report.

 The trial judge's post-trial competency ruling briefly referred to petition-er's "conduct during the course of the trial" as a basis for informing his "considered opinion." (T. vol. IV, 367–68.) Trial demeanor may be relevant to the · ultimate determination of competency but is not a substitute for a hearing. *Pate,* 383 U.S. at 386, 86 S.Ct. at 842. Trial demeanor is of questionable probative value, however, since the forms and conventions followed by courts of law necessarily overlay a veneer of fitness. The court's inquiry is whether petitioner was fit to be tried, not whether he was tried fitly. Trial conduct is more likely to bear on the former question rather than the latter.

The Tenth Circuit's decision in *Lafferty v. Cook, supra,* is analogous to the instant case. The Tenth Circuit found a state court's attempt to buttress a pretrial finding of competence by referencing trial demeanor unpersuasive for three reasons. First, since Lafferty was afforded competency hearings, on habeas corpus review, the reviewing court was compelled by statute to find fair support based on "that part of the record of the State court proceeding in which determination of such factual issue was made." 28 U.S.C. § 2254(d)(8). The Tenth Circuit deemed the pretrial determination critical because it "enabled Lafferty to make the crucial decision to waive an insanity defense, contrary to the forceful advice of his frustrated attorney." *Lafferty,* 949 F.2d at 1555.

Second, the Tenth Circuit found that the outward demeanor of an incompetent may not reveal the extent of impairment. *Id.* "Indeed, a defendant operating in a paranoid delusional system may well believe that he is not mentally ill and therefore, as did Lafferty, refuse to present the defense at all. This result can not be reconciled with the requirements of due process." *Id.* at 1556. Third, the Circuit found that reliance on trial demeanor was unpersuasive because the trial court had applied a mistaken view of the *Dusky* rational understanding requirement. *Id.* 949 F.2d at 1555–56.

All of these considerations are applicable herein. First, after the pretrial hearing, petitioner not only waived an insanity de-

fense, he functionally waived all defenses, against the wishes of his one-time counsel. Petitioner also waived his right to counsel based on the pretrial competency hearing. Second, like Lafferty, petitioner consistently argued his own competence and refused to present any defense suggesting that he was less than sane. The trial judge permitted this, despite expert evidence suggesting that this conduct was not the product of a rational mind.

Finally, as previously noted, the trial judge misapprehended the *Dusky* test. In fact, even in his post-trial ruling, the trial judge repeats the litany of factors upon which his decision was based, without mentioning rational understanding. "I am persuaded that he did and does understand the nature of the proceedings, that he did and that he does understand the nature and extent of the charges against him." (T. vol. IV, 367.) All of the factors discussed in *Lafferty* for excluding consideration of trial demeanor are present in the instant case. Therefore, it is both proper for this court to focus on the pretrial determination and to exclude consideration of trial demeanor.[2]

Where, as here, a factual conclusion is based on either an erroneous rule of law or arbitrary disregard of objectively reliable expert psychiatric evidence, the finding is not entitled to a presumption of correctness. Since, as previously noted, the court can not now engage in a *nunc pro tunc* determination of petitioner's competency to stand trial nine years ago, the court is compelled to decide that petitioner's substantive right not to be tried while incompetent was abridged and that his conviction and sentence should be vacated.

### III. *Waiver of Counsel.*

The Supreme Court recognized that coordinate with the Sixth Amendment right to have counsel is a right to self-representation. *Faretta v. California,* 422 U.S. 806, 821, 95 S.Ct. 2525, 2534, 45 L.Ed.2d 562 (1975). The Court acknowledged that exercising the right to self-representation necessarily waives the right to counsel and that self-representation entails sacrificing the normal benefits of legal counsel. *Id.* at 835, 95 S.Ct. at 2541. The decision to waive counsel must be made "knowingly and intelligently." *Id.*

> Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, *he should be made aware of the dangers and disadvantages of self-representation,* so that the record will establish that "he knows what he is doing and his choice is made with eyes open."

*Id.* (*quoting Adams v. United States ex rel. McCann,* 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942)) (emphasis added).

Respondent cites this Circuit's opinion in *U.S. v. McDowell,* 814 F.2d 245, 249 (6th Cir.1987) *cert. denied* 484 U.S. 1037, 108 S.Ct. 764, 98 L.Ed.2d 781 (1988), for the proposition that waiver may be achieved through a nonformalistic determination of the sufficiency of a waiver. In *McDowell,* however, the trial judge "repeatedly indicated to McDowell, and the other parties to the trial in McDowell's presence, that he thought McDowell was making a mistake and was 'in over his head.'" *Id.* at 247. The fact that standby counsel was also appointed did not alter the fact that McDowell was exercising his right to self-representation.

Since respondent relies on a nonformalistic approach to waiver, rather than pointing to an in-depth inquiry as is now called for by law, it is necessary to consider the totality of the proceedings to determine whether waiver was knowing and intelligent.

As previously detailed, the issue of self-representation was extensively discussed at the April 8 competency hearing. Petitioner seemed to believe that no attorney could adequately argue his case because the attorney would be an affront to his beliefs.

---

2. The court does not intend to suggest that petitioner's trial demeanor would in fact support a finding of competence. Rather, the court simply points out that it is neither necessary nor appropriate to consider such conduct in the instant case.

I don't have anything against [Ms. Millhoff] as a person, but the apparatus from which she works from as opposed to my belief, and she can't serve me and serve righteousness and evil so she can't do it. I'm not going to bring her in to that type of burden. That's why I wish to relieve myself from her, you know, I represent myself. If you can give me counsel—you can give me somebody to dictate the procedures, but as far as speaking for me, I speak for myself. She don't teach what I speak at no lawyer's firm or no law school.

(T. vol. I, 14.) Judge Reece asked petitioner about his education and petitioner responded that he dropped out of school after eleventh grade but that he could read and write and had a G.E.D. (*Id.* at 28.)

At times, the conversation between the judge and petitioner was at the least unclear.

Court: So, after you read the police reports, are you going to be able to talk to your attorney about it?

Defendant: Oh, I'm going by myself. You going to give me counsel, ain't you?

Court: Yes. You're going to have one whether you want one or not.

Defendant: You going to let me go pro se like with a counsel or are you going to stick me with somebody ain't no attorney going to be able to talk like me or express theirself like me?

Court: I will agree with that. I agree with that, not be able to talk like that. I agree with that.

Yes. You're going to have a lawyer and probably have the lady you've got.

(*Id.* at 30.)

Petitioner objected to Attorney Millhoff saying, "I see Pat as a rose, and I going to battle with thorns and I don't want to lose her fragrance at all." (*Id.*) Judge Reece assured petitioner that Ms. Millhoff "is about as far outside the order as anybody I can think of. She's pretty much of a rebel herself. She is always giving somebody a bad time." (*Id.* at 33.) At this point, it appears that the judge had decided to permit petitioner to represent himself with standby counsel.

Later, it was established that petitioner had been convicted of a previous crime. Petitioner "copped a plea" to a robbery in California, where he was represented by a male attorney. (*Id.* at 38–39.) Judge Reece's questioning again returned to self-representation.

Court: ... [D]o you think you know what you're doing to go to trial if you represent yourself?

Defendant: Uh-huh.

Court: What makes you think so?

Defendant: Because I'm going to be judging on a higher plane. I'm going to be judging the whole situation, although I'll be being judged—people will be getting judged itself. It is not just me being judged. Everybody being judged at that same, you know.

(*Id.* at 46.) Finally, the court resolved the competency issue and returned to petitioner's desire to represent himself.

Court: ... Just a question of how we're going to proceed to keep you happy. I guess that's the main thing.

Defendant: I could never really know happiness on the virtue side of life. I can't be happy when I have brothers that's not happy.

Court: That's a poor choice of words, I guess. I guess none of us are going to know true happiness.

Defendant: We'll get it, but just not in this—

Court: That's what I meant.

So, anyway, you think if I let you participate in your own trial, along with a lawyer, you'll be able to handle it, huh?

Defendant: Yeah. I'll be able to handle it. I'll be all right going through the ceremony. That's all it is.

Court: That's about what it is, a ceremony. Are you going to be able to understand the ceremony as it goes along?

Defendant: Oh, definitely.

(*Id.* at 49.)

The day before the trial commenced, Ms. Millhoff reported to Judge Reece that problems had arisen regarding her representation of petitioner. (*Id.* at 63.) In conjunc-

tion therewith, the judge again briefly questioned petitioner.

Court: You still [sic] tend to act as your own counsel in this case?

Defendant: Well, I be representing myself but it won't be to cross-examining or, you know, interrogate witnesses or nothing like that. It will just be to make my plea like towards the jurors.

Court: All right. How do you feel about her sitting in on your trial?

Defendant: It is her prerogative, you know, like she expressed, if she's going to be negative, it's going to be enough negativeness in court, I don't need it. I don't need it attached to me.

Court: Well, I guess what it comes down to is you're going to have to have somebody, either her or somebody else. I don't know if we can find anybody with positive feelings. I don't think I'm going to spend a whole lot of time looking for somebody with positive feelings.

Defendant: That would only express your lack of concern, you know, so be it, you know, just go on with your procedures. You got me, I just want to express myself. I guess this is more for my growth, I'm trying to separate myself, you know, from the powers of the world. I don't want to have nothing to do with it, but I just want to make my expression to the jury, you know. I don't want—I don't wish them to come back with a not guilty or a guilty—just to plea with them—don't participate.

Court: All right.

(*Id.* at 67–68.)

Ms. Millhoff did argue for the suppression of certain evidence without permission or assistance from petitioner. However, petitioner, as previously noted, insisted on giving the only opening argument and thereafter refused to allow Ms. Millhoff to participate any further in the proceedings.

 As an initial matter, the court notes that a defendant must be competent to waive the right to counsel. Moreover, the degree of competency required to waive counsel is "vaguely higher" than the standard for standing trial discussed *supra*. *McDowell*, 814 F.2d at 250. Thus,

those fundamental deficiencies regarding petitioner's competency hearing we have mentioned also poison petitioner's supposed waiver of his right to counsel. But even if petitioner's competency hearing were satisfactory and the trial judge's deliberations legally sufficient, the record does not support a finding of knowing and intelligent waiver of the right to counsel.

The words of the judge indicate that he wished primarily to keep petitioner happy 'through the ceremony' as both men termed the trial process. This court is not of the opinion that the trial judge's words in this context are to be read literally. But even though this view is taken, there is no portion of the entire record in which the trial judge informs petitioner that he would be better served by legal counsel than by his own efforts.

 Respondent would have the court characterize the issue not as waiver of counsel, but rather as an issue of what defenses a defendant must raise. This argument assumes that the presence of stand-by counsel precludes self-representation and that Ms. Millhoff made substantial contributions. First, the presence of stand-by counsel is not inconsistent with self-representation. *Faretta*, 422 U.S. at 835, fn. 46, 95 S.Ct. at 2541, fn. 46 ("[A] State may—even over objection by the accused—appoint a 'standby counsel' to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary.") Second, Ms. Millhoff only participated meaningfully in one suppression hearing. Otherwise, she was foreclosed by the trial judge from contributing in the competency hearing and by petitioner from participating at trial.

Petitioner's background, conduct and experience were so troubling to Judge Reece that a hearing was held to determine competency to stand trial. These factors do not now support a finding of knowing and intelligent waiver. The record fails to support a finding of knowing and intelligent waiver because petitioner's dialogue with the judge does not establish that petitioner

appreciated any of the dangers or disadvantages of self-representation. In fact, from petitioner's remarks, it appears that the only disadvantages of which petitioner was cognizant were the disadvantages which inhered to being represented by counsel. The trial court did not at any point suggest to petitioner, let alone explicitly instruct him, that self-representation was legally dangerous and is discouraged.

Petitioner's trial is constitutionally tainted because the trial judge failed to secure a knowing and intelligent waiver of petitioner's right to counsel. Petitioner was deprived of the benefit of having counsel cross-examine witnesses, put on evidence, and make cogent arguments—all of which Attorney Millhoff is likely to have done had petitioner not waived his right to counsel in ignorance of the legal implications.

## IV. *Rule 9(a).*

 Respondent very briefly notes that Rule 9(a), Section 2254 Rules, may justify dismissal. Rule 9(a) provides:

> A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petition shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before circumstances prejudicial to the state occurred.

The Sixth Circuit applies a two-prong test to determine whether a petition should be dismissed for prejudicial delay.

> First, the state must appear to have been prejudiced in its ability to respond to petitioner's claim. Second, the petitioner must be given the opportunity to meet or rebut the apparent prejudice to the state, or to show that whatever prejudice the state has suffered would not have been avoided had the petition been filed earlier.

*Davis v. Adult Parole Authority,* 610 F.2d 410, 413 (6th Cir.1979). Respondent has the burden of making a particularized showing of prejudice. *Hill v. Linahan,* 697 F.2d 1032, 1035 (11th Cir.).

 In the instant case, respondent's particularized showing is, "the question of prejudice is far from manifest at this point in the proceedings, the Rule 9(a) issue is raised now in order to preserve it." Respondent has not mentioned Rule 9(a) again. Whether or not such a *de minimis* invocation of Rule 9(a) preserves the issue for appeal, it is clear that respondent has not only failed to show any prejudice, respondent has not attempted to do so. Petitioner does not have the burden of proving that the state was not prejudiced absent a particularized showing by respondent. The Rule 9(a) argument is meritless.

## CONCLUSION

First, petitioner's right to procedural due process was violated when his representative was denied the opportunity to submit additional evidence or to examine the findings upon which the trial judge based his ruling against petitioner. Second, petitioner's right to substantive due process was also violated when he was tried after the trial judge found him competent by applying an erroneous rule of law. Since these violations implicate the sufficiency of the record, this court can not now determine petitioner's competency to stand trial in 1983 based on the record. The passage of time renders a *nunc pro tunc* hearing to supplement the record inadvisable. Third, petitioner's trial is tainted by his insufficient waiver of the Sixth Amendment right to counsel.

Both petitioner and respondent had other objections to Magistrate Judge Gallas' report and recommendations. These issues need not be addressed because the preceding analysis effectively resolves this case.

Each of the three foregoing problems independently justify petitioner's motion for a writ of habeas corpus. Accordingly, the writ of habeas corpus shall issue and the petitioner shall be released unless within ninety days of this order the State of Ohio begins new trial proceedings against him.

IT IS SO ORDERED.